UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

KIMBERLY SHANTEL GLOVER,                    :

                Plaintiff,                    :                    17 Civ. 2889 (AJP)

          -against-                    :                    **OPINION & ORDER**

NANCY A. BERRYHILL,                    :
Acting Commissioner of Social Security,
                           :

                Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Kimberly Shantel Glover, represented by counsel, brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 18: Glover Notice of Mot.; Dkt. No. 21: Comm'r Notice of Mot.) The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 20.)

        For the reasons set forth below, the Commissioner's motion for judgment on the pleadings (Dkt. No. 21) is <u>GRANTED</u> and Glover's motion (Dkt. No. 18) is <u>DENIED</u>.

## <u>FACTS</u>

### <u>Procedural Background</u>

        Glover filed for DIB and SSI on October 5, 2015, alleging a disability onset date of March 1, 2014. (Dkt. No. 14: Administrative Record ("R.") 314, 318.) Glover's benefits application

was denied on December 2, 2015 (R. 108-14), and she requested a hearing before an Administrative Law Judge ("ALJ") on February 6, 2016 (R. 116-17). On July 7, 2016 and November 9, 2016, Glover, represented by counsel, had hearings before ALJ Hilton Miller (R. 36-81), who denied Glover's benefits application in a written decision issued November 23, 2016 (R. 15-30). At the second hearing, Glover amended her alleged disability onset date to October 5, 2015. (R. 65-66.) ALJ Miller's decision became the Commissioner's final decision when the Appeals Council denied review on February 24, 2017. (R. 1-3.)

**Non-Medical Evidence and Testimony**

Born on April 30, 1986, Glover was twenty-nine years old at the alleged October 5, 2015 onset of her disability. (R. 65-66, 314.) Glover testified that she has a six year old son and lives in a three bedroom apartment with her mother, stepfather and son. (R. 52.) Glover's mother cooks, shops, and cleans for the family. (R. 43.) Glover received her high school diploma[1] online through Job Corps.[2] (R. 52.) Prior to Glover's alleged disability onset date, she worked as a hairstylist and at a nursing home. (R. 39, 42.)

On July 2, 2015, Glover was brought to the emergency room after her mother suspected she had "overdosed on pills." (R. 42.) Although Glover testified that she could not "remember too much of anything that day," she stated that she did not "even know" if it was a suicide attempt, and that she "was really stressed out" and "had a nervous breakdown." (R. 40, 42-43.) Glover spent three days in the psychiatric ward and started seeing a therapist and psychiatrist

---

[1] It is unclear whether Glover obtained her diploma or GED. (R. 52, 508.)

[2] Job Corps is a federal program funded by the U.S. Department of Labor that provides free education and vocational training for individuals between the ages of 16 and 24. See https://www.jobcorps.gov/.

upon discharge.  (R. 41.)

Glover testified that she is disabled due to "anxiety" and "bad memory." (R. 50.) She stated that she cries "[m]aybe like twice a week," has "anxiety attacks, like, pacing back and forth," and "can't sleep." (R. 44.)  Glover relies on her mother and stepfather to complete the household chores and accompany her to appointments.  (R. 43-44, 55.)  Glover testified that she cannot concentrate but can "[s]ometimes" follow a movie from beginning to end. (R. 43.)  Glover does not have any hobbies or friends, and stays home, sometimes watches television, and sleeps "[m]ost of the time." (R. 43, 51-52.)  Glover stated that she does not go out and socialize, but rather stays in her room. (R. 55.)  Glover had difficulty answering questions during the second hearing because she was "a little tired from the medicine." (R. 50.)  Glover is prescribed Zoloft and Vistaril (R. 448), which she has taken since beginning psychiatric treatment a year prior to the first hearing (R. 41).

In her October 16, 2015 function report, Glover stated that her daily activities include "sleep, watch TV, take care of my son." (R. 363.)  Glover feeds her son, gets him ready for school, takes him to doctor's appointments and does "everything he need[s]," with assistance from her mother and step-father. (R. 364.)  Glover does not do housework because of her "scoliosis and too depressed and tired." (R. 366.)  Glover goes outside "not often, only if [she] ha[s] to for [her] son or [her] doctor appointments." (Id.)  Glover cannot go out alone because of her bad memory and fear of people. (Id.)  Glover, however, goes shopping "once a month for a[n] hour." (Id.)  Glover claimed in her function report that she cannot follow spoken or written instructions, and has trouble remembering things. (R. 370.)  Glover has no problem getting along with "bosses . . . or other people in authority," and has never lost a job "because of problems getting along with people." (Id.)  Glover "can't stand up for a long time," "can't walk too long [because her] back will hurt," "can't sit up straight," and cannot climb stairs "too much." (R. 368.)  Glover can walk five blocks before she

has to stop and rest for ten minutes.  (R. 369.)

At the first hearing, ALJ Miller asked Glover: "Do you have any physical problems, or are they all mental?"  (R. 42.)  Glover responded that her problems are "mainly mental."  (Id.)  ALJ Miller also asked Glover's attorney, "And is it just mental problems, no physical?"  (R. 45.)  Glover's attorney responded, "That's correct.  This is a psychiatric case."  (Id.)

Glover's attorney argued that Glover suffers from social anxiety and cognitive weaknesses, which "would be apparent in a job situation requiring interaction."  (R. 54.)  He stressed that Glover could not maintain a job because these problems would cause her to "be off task and indeed unable to get to work at times," resulting in excessive absences.  (Id.)  Glover's attorney asked her the following hypothetical question:

> suppose someone said to you there is a job.  A sports club, a gym that sends their towels to us to the laundry, and all you have to do is sit there and fold those towels for an eight-hour work day.  Could you do that?

(R. 55.)  Glover responded "no," it would be "[t]oo much."  (Id.)

Clinical psychologist Dr. Joseph Carver (R. 57) reviewed Glover's medical records and testified that Glover attended regular high school classes and was last employed at a nursing home kitchen for approximately two years (R. 58).  Glover stopped working when asked by her employer to relocate.  (Id.)  Dr. Carver added that Glover's work history was "commensurate with her education."  (R. 62.)

Dr. Carver noted that in a March 26, 2016 psychiatric evaluation with Glover's treating psychologist Dr. Lucy Kim, Glover was cooperative and her mood was euthymic, i.e., "within normal range"; Dr. Kim "opined no vocational impairments" and diagnosed Glover with unspecified "depressive disorder" and "possible social anxiety disorder."  (R. 58-59; see pages 18-20 below.)  Dr. Kim found that there were "no cognitive or other factors" when "addressing work-

related activities," and further opined that Glover had a "mild impairment in social functioning." (R. 59; see pages 18-20 below.)

Dr. Carver next discussed Dr. Cristina Toba's June 20, 2016 medical source statement that included diagnoses of major depressive disorder and anxiety, and assessed a GAF score of 55. (R. 59; see pages 16-17 below.) Dr. Carver opined that Dr. Toba's statement was "actually extremely exaggerated." (R. 59.) Dr. Carver opined that Dr. Toba "indicated many areas of extreme loss suggesting a complete inability to sustain any kind of work activity." (Id.; see pages 16-17 below.) "One of the things that [was] indicated," Dr. Carver noted, was an "extreme loss in [Glover's] ability to understand and remember simple instructions." (R. 59; see page 16 below.) However, Dr. Carver opined that "that's actually the requirement of an interview," and thus "[t]he fact that [Glover] responds to questions appropriately and so forth makes that an error." (R. 59.)

Moreover, although Dr. Fredelyn Engelberg's July 25, 2016 psychiatric evaluation indicated that Glover experienced auditory hallucinations (see page 20 below), Dr. Carver opined that "hear[ing] things at night, whispering . . . is very common when people fall asleep or when they wake up" (R. 60). According to Dr. Carver, this phenomenon, known as a "hypnagogic experience," "doesn't qualify as a psychotic symptom." (Id.) Glover's presentation was fair, she was cooperative and her behavior was normal. (Id.; see page 21 below.)

In addition, Dr. Carver stated that Glover "offer[ed] contradictory information, stating that she went to the eighth grade in special education," rather than regular classes as reflected elsewhere in the record. (R. 59; see page 20 below.) Dr. Carver opined that it is "clearly an exaggerated statement for a person who has worked as a cashier" and in a nursing home to claim an inability to cook, clean, do laundry, or shop. (R. 60.) Furthermore, Dr. Engelberg, who "defined some mild impairments [and] felt that [Glover] would be markedly impaired in her ability to do .

. . complex work activities," also found that Glover's verbal comprehension and perceptual reasoning levels were 72 and 79, respectively, and had a full scale I.Q. of 70. (Id.; see pages 21-22 below.) Dr. Carver did not "see anything that would create a vocational incapacitation." (R. 60-61.)

Dr. Carver also noted that there were "a lot of inconsistencies." (R. 61.) Dr. Carver stated that "if we look at the records by the psychiatrist before and after that medical source statement, the mental status examinations only reflect the mild impairment in depression. Nothing certainly that would meet the criteria for an extreme or marked impairment." (Id.) Dr. Carver further stated that Glover may have exaggerated her symptoms when she, for example, "suggest[ed] to the psychologist [Dr. Engelberg] that she is unable to cook or shop because she doesn't know how." (R. 66-67; see page 21 below.)

Dr. Carver opined that Glover is "totally capable of reaching daily activities, laundry, shopping, so forth," but "is socially shy" and "may have mild impairment in dealing with others." (R. 61.) Dr. Carver stated:

> In her past employment, she has worked with public contact. She's worked as a cashier, as a hair stylist, [and] kitchen help at the nursing home. She's had a lot of public contact jobs. So there's no real[] suggestion of agoraphobia or a severe social incapacitation. Concentration, persistence, and pace may be mildly impaired . . . .

(Id.) Dr. Carver emphasized that Glover's employment at the nursing home ended because she refused to relocate, "not because of physical or psychological problems." (R. 62.)

ALJ Miller asked Dr. Carver if there were any medical records that explained Glover's memory issues and seeming "a little dazed." (R. 66.) Dr. Carver opined that the record did not reflect any "condition that would create selective memory deficits." (Id.) He added that Glover's depression "is severe in that it creates some issues with employment and functioning," but he did not believe that it would "create a vocational incapacitation." (R. 67.) Moreover, Dr. Carver stated

that Glover's condition did not meet the Paragraph B criteria of the applicable Listing. (R. 66.) Dr. Carver clarified that "none of [Glover's] impairments singly or in combination meet or equal any of the listings." (R. 67.)

Dr. Carver opined that Glover "would have difficulty with complex job instructions," but is "capable of simple, routine, and detailed job instructions." (Id.) Glover would need a position that requires a "routine," a "schedule" and "predictable activities," and she would have "mild difficulties working with others," and "moderate problems working with the general public." (R. 67-68.) Glover therefore should be limited to "occasional contact with the general public." (R. 68.) Dr. Carver, however, stated that there was no indication Glover had issues working with others, and she had "no difficulty understanding tasks." (Id.) Dr. Carver accordingly opined that there was no justification for the "large spike in extreme limitations by a tending psychiatrist." (Id.)

Finally, vocational expert Mary Anderson testified at the hearing before ALJ Miller. (R. 72.) ALJ Miller posed two hypothetical questions to Anderson, the first of which asked:

> [P]lease consider a hypothetical individual of [Glover's] age, education, work experience, and the residual functional capacity to lift and/or carry up to 20 pounds occasionally, 10 pounds frequently, stand and/or walk with normal breaks for a total of about six hours in an eight-hour work day, sit with normal breaks for a total of about six hours in an eight-hour work day. Can occasionally climb ramps or stairs, no ladders, ropes, or scaffolds, occasionally balance, kneel, crouch, squat, and no crawling, and no bending. Does not require manipulation utilizing the bilateral lower extremities such as foot controls or foot pedals, does not involve hazards such as dangerous machinery, motor vehicles, unprotected heights, or vibrations. That takes into account non-exertional limitations allowing the performance of simple, routine, and repetitive tasks that can be explained, specifically SVPs 1 and 2 which involve making simple decisions, occasional changes in routine, no work with the general public, and only occasional and superficial contact with coworkers and supervisors. With these limitations, would there be any jobs?

(R. 76-77.) Anderson testified that an individual with these limitations could do the work of a merchandise marker, stamper and room attendant, which are light work and exist in substantial

numbers in the national economy.  (R. 77.)

ALJ Miller's second hypothetical asked Anderson:

[C]onsider all the factors in hypothetical number one.  But instead of the light exertional level, would you consider the residual functional capacity to perform work at all exertional levels that takes into account none exertional limitations, allowing the performance of simple, routine, and repetitive tasks that could be explained, specifically SVPs 1 and 2 which involve making simple decisions, only occasional changes in routine, no work with the general public, and only occasional and superficial contact with coworkers and supervisors.  With these limitations, would there be any jobs?

 (R. 77-78.)  Anderson testified that the individual would be able to do the work of lab equipment cleaner and address clerk, which exist in substantial numbers in the economy, in addition to the jobs outlined in the first hypothetical.  (R. 78.)

Glover's attorney asked Anderson: "if a person is homebound more than one time per month on a day she should be at work and does not show up to work for that reason, would that affect her employability?"  (R. 79-80.)  Anderson opined that Glover would not be able to sustain employment.  (R. 80.)  When Glover's attorney asked if an individual would be employable if she were consistently late (by at least a half hour) more than once a week, Anderson responded that "the individual would not be able to maintain employment."  (R. 80-81.)

**Medical Evidence Before the ALJ**

**Physical Impairments**

**Industrial Medicine Associates, P.C.**

On November 9, 2015, Dr. Dipti Joshi conducted an internal medicine examination of Glover at Industrial Medicine Associates, P.C.  (R. 456.)  Glover reported depression, dyslexia, insomnia, fear of people, poor memory, scoliosis and back pain.  (Id.)  Glover stated that her back pain improved with Ibuprofen, but increased when sitting and walking for extended periods.  (Id.)

She denied suicidal or homicidal ideation.  (Id.)  Glover stated that she lived with her mother, and showered, bathed, dressed and watched television daily.  (Id.)  Glover's physical examination was normal.  (R. 456-58.)  She was in no acute distress, had a normal gait and stance, could walk on her heels and toes without difficulty, could squat fully, used no assistive devices, needed no help changing or getting on and off the exam table, and could rise from her chair without difficulty.  (R. 457.)  Additionally, Glover had full range of motion of her hips, knees and ankles bilaterally, and stable joints.  (R. 457-58.)  The only abnormalities noted were tenderness in the upper lumbar spinal area, trigger points paraspinally, and 4/5 lower extremity strength.  (R. 458.)  Glover was diagnosed with scoliosis, back pain in her thoracolumbar sacral region, depression, dyslexia, short-term memory loss, migraine headaches, insomnia and phobia of people.  (Id.)  Dr. Joshi opined that Glover "should avoid heavy lifting, carrying, pushing, and pulling" and that Glover had "marked limitations with bending."  (Id.)

**Bronx Lebanon Hospital Center**

On December 10, 2015, Glover complained of lower back pain and stated that she had a history of scoliosis.  (R. 535.)  Glover was seen by Dr. Ashley Simela and denied any back injuries or trauma, weakness, loss of sensation, any recent febrile illness or unintentional weight loss.  (Id.)  Glover's physical examination was normal; she appeared in no distress, had normal gait, scored a 5/5 in all categories of strength and had a negative straight leg raise test bilaterally.  (R. 535-36.)  Imaging of Glover's lower back revealed mild scoliosis.  (R. 536.)  Glover stated that she was seeking disability benefits and Dr. Simela told Glover that her degree of scoliosis would not usually cause back pain, and that the pain was "quite likely" caused by being overweight.  (Id.)  Dr. Simela referred Glover for physical therapy.  (Id.)

**Psychiatric Impairments**

**Bronx Lebanon Hospital Center**

On July 2, 2015, Glover was brought to the hospital by her mother after a possible drug overdose. (R. 476.) Glover's mother stated that Glover was yelling at her five year old son and said that she did not want to live anymore. (Id.) Glover's mother stated that upon finding Ibuprofen pills in a glass of water and more pills in the sink, she did not know how many pills Glover had ingested and decided to take her to the hospital. (R. 476-77.) At the hospital, Glover was "agitated and abusive" and needed to be sedated. (R. 477.) A physical examination was within normal limits and a blood test revealed "[n]o laboratory abnormalities of acute significance," except that Glover was intoxicated. (R. 477-82.)

Glover was discharged on July 4, 2015 when she became alert, calm, pleasant, and cooperative with a full affect, and the hospital believed her risk for suicide was "low." (R. 489-90.) Glover was oriented, coherent, organized, made good eye contact, stated that she had no delusions, paranoia, or hallucinations and denied suicidal/homicidal ideation. (R. 489.) The treating physician noted that Glover had a history of active substance abuse and her mood seemed depressed; however, Glover's speech and reasoning were normal, her attention, concentration, insight and memory were intact, and her impulse control was adequate. (R. 490.) The physician additionally noted that Glover did not report insomnia, stressful life events, suicidal thoughts, delirium or hopelessness (id.), and had a GAF score of 60 (R. 492). Glover was diagnosed with alcohol abuse and depression. (R. 491-92.)

**Rajesh Patel, M.D.**

On August 11, 2015, Glover had her initial outpatient therapy appointment with Dr. Rajesh Patel. (R. 448-51.) Glover stated "I am fine," but also stated that she had been "very depressed" due to problems with her son's father, who "mentally abused" her three to four years ago.

(R. 448.)  Since then, Glover had isolated herself and "cried for no reason."  (Id.)  Glover claimed that she was anxious around groups of people and had difficulty sleeping, but denied panic attacks, PTSD, acute mania or psychosis.  (Id.)  Glover denied drug or alcohol use (R. 448), although she was hospitalized twice due to alcohol intoxication in 2015 and 2016 (R. 489, 499).  Glover's mental status examination was normal; she was well groomed, cooperative, fully oriented, denied suicidal/homicidal ideation and hallucinations, had a logical and directed thought process, average intelligence, full consciousness, and had normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control.  (R. 449.)

On September 8, 2015, Glover stated that she was taking her medications, but still experienced difficulty sleeping.  (R. 446.)  Although she experienced "periodic anxiety," her mood was less depressed and she denied medication side effects.  (Id.)  Glover's mental status exam was normal; she had average intelligence, a logical and directed thought process, and normal speech, mood, orientation, memory, reasoning, insight, judgment, attention, concentration and cognition. (Id.)  She denied hallucinations or suicidal ideation.  (Id.)  Glover was prescribed hydroxyzine hydrochloride, sertraline, an increased dose of Zoloft, and two hydroxyzine pamoate prescriptions. (R. 446-47.)  She was diagnosed with adjustment disorder with depressed mood.  (R. 446.)

On October 6, 2015, Glover was seen for medication management.  (R. 442.)  She reported feeling less depressed and more emotionally stable.  (Id.)  Glover's mental status exam was normal; she had average intelligence, a logical and directed thought process and normal speech, mood, orientation, memory, reasoning, insight, judgment, attention, concentration and cognition. (Id.)  She denied hallucinations or suicidal ideation.  (Id.)  Glover was diagnosed with depression, and received prescription refills.  (R. 442-43.)

**Tonya Gaston and Cristina Toba, M.D.**

On July 23, 2015, Glover was evaluated by social worker Tonya Gaston. (R. 453-54.) Glover was accompanied by her mother, and stated that she was taking sleep medication but not able to fall asleep until one in the morning. (R. 453.) Glover reported feeling slightly less anxious, but continued to feel "watched in crowds and on public transportation." (Id.) She stated that she was previously able to work part time and use public transportation, but now "prefer[s] to live in doors, around people." (Id.) Glover additionally stated that she was "'[s]till hurting from what [her child's father] did to'" her and did not trust him. (Id.) Gaston noted that Glover was "fixated on the father of her baby," was "angry and untrusting of him," and referred to him as a "'sociopath.'" (Id.) Gaston reported that Glover had paranoid delusions, poor insight, moderately impaired judgment, an anxious mood and impaired abstracting ability. (Id.) However, Glover was well groomed, cooperative, fully oriented, had a concrete thought process, full consciousness, denied hallucinations, and had normal speech, attention and memory. (Id.)

On September 15, 2015, Glover had a follow-up visit with Gaston. (R. 444.) Gaston noted that Glover's GAF score was 50 and that she had good communication skills, family and social support, a stable home, and vocational skills. (Id.) Glover was diagnosed with depression, circadian rhythm sleep disorder and scoliosis. (Id.) Gaston additionally noted that Glover's target symptoms had stabilized and medication helped "'a little bit'" with sleep. (Id.)

On October 13, 2015, Glover was seen by Gaston and Dr. Cristina Toba. (R. 494.) Gaston noted that Glover was able to read and write, was capable of insight, had good communication and vocational skills, family and social support, exhibited no violence or aggression and lived in a stable home. (Id.) Glover reported slight improvement in her mood and sleep with medication and stated she felt improvement in crowded situations. (Id.) She was diagnosed with

depression, scoliosis, and circadian rhythm sleep disorder.  (Id.)

On November 16, 2015, Glover stated that her mood had been stable and she was less depressed, reporting a six out of ten sadness "close to baseline"; Glover further stated that she was enjoying spending time with her son, had good energy, appetite and concentration, and was not feeling any hopelessness, helplessness or anhedonia.  (R. 524.)  Glover reported that her anxiety was still bothersome and she was unable to go outside by herself because she felt embarrassed and panicky in pubic situations.  (Id.)  Glover denied suicidal/homicidal ideation, hallucinations and mania.  (Id.)  Glover was fully oriented, well groomed, had average intelligence and a logical and directed thought process, and normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight and judgment.  (Id.)

On December 17, 2015, Glover missed a scheduled appointment with Dr. Toba and ran out of sleep medication.  (R. 538.)

On January 14, 2016, Glover began her session with Dr. Toba by saying, "'I have gotten over my son's father and all that he has done to me.'"  (R. 537.)  She stated that she was going to try and do more activities to help her son.  (R. 538.)  Glover's mood was anxious, and she had fair insight and impulse control, and mildly impairment judgment.  (Id.)  Glover denied suicidal/homicidal ideation and hallucinations.  (Id.)  Glover was well groomed, cooperative, fully oriented, calm, had average intelligence, and had normal speech, memory and attention with a coherent thought process.  (Id.)

On January 20, 2016, Glover met with Gaston and Dr. Toba.  (R. 497-98.)  Dr. Toba noted that Glover had not kept her clinical appointments and missed three months of scheduled treatment.  (R. 498.)  Glover denied "feeling as depressed and angry towards her son's father whom she obsess[ed] over."  (Id.)  Glover stated that she felt less depressed, but "remain[ed] phobic and

anxious." (Id.)

On January 22, 2016, Glover stated that her mood had been stable and reported 7/10 sadness, anhedonia, low energy, poor sleep and hopelessness/helplessness more than fifty percent of the time. (R. 541.) She was fully oriented, had no delusions, average intelligence, intact concentration, attention, insight, judgment and memory, normal reasoning, adequate impulse control and a logical and directed thought process. (Id.) Glover also was well groomed and had a cooperative attitude. (Id.) Glover, however, complained of auditory hallucinations, specifically "hearing voices at night." (Id.) Glover said she cannot go outside or be in crowded places or take public transportation. (Id.)

Glover missed her appointment on February 3, 2016 and rescheduled for February 5, 2016 but also missed that appointment. (R. 545.) She rescheduled for February 8, 2016 but again missed the appointment. (R. 555.)

On March 25, 2016, Glover stated that she was housebound when her mother and step-father were not home and had felt scared around people her entire life. (R. 556.) Glover stopped taking her anxiety medication because it did "'nothing for her'" and made her "'eat a lot.'" (Id.) Glover, however, stated that she still took sleep medication but was up all night because her mind raced. (Id.) Glover denied suicidal/homicidal ideation or hallucinations, was casually dressed and cooperative, made good eye contact, had a coherent thought process, a full level of consciousness, and normal attention and reasoning with fair insight and impulse control. (Id.) Glover, however, was anxious, "not oriented to time," forgetful and her judgment was moderately impaired. (Id.)

On March 31, 2016, Glover stated that her mood had been "'up and down.'" (R. 557.) Although she was still depressed, her sadness was a 6/10. (Id.) Glover told Dr. Toba that she heard

voices at night and believed they could be caused by sleep deprivation. (Id.) Glover stated that she was inconsistent with her anxiety medication, taking it only two times a week. (R. 558.) Glover denied suicidal/homicidal ideation or hallucinations, was well groomed and cooperative, fully oriented, had a logical and directed thought process, average intelligence, full consciousness, and normal speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control. (Id.)

On April 25, 2016, Glover missed her appointment. (R. 561.)

On April 29, 2016, Glover stated that she experienced 6/10 sadness, depression, anhedonia, low energy and poor concentration. (R. 562.) Glover denied suicidal/homicidal ideation or hallucinations, was well groomed, cooperative, fully oriented, had a logical and directed thought process, average intelligence, full consciousness, and normal attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control. (R. 562-63.) Dr. Toba increased Glover's Zoloft prescription to 150mg. (R. 563.)

On June 6, 2016, Glover "shared her efforts to get [Social Security] benefits." (R. 566.) She stated that she sat in her room with the blinds down because she felt like someone was watching her from the outside. (Id.) Glover stated she was afraid to be in her apartment alone and had been experiencing out of body dreams, which made her feel like she was dead. (Id.) Glover admitted that she was smoking much more frequently because she stopped her medication and, as a result, her anxiety had become worse. (Id.) Glover denied suicidal/homicidal ideation or hallucinations, was casually dressed, fully oriented, made good eye contact, had an open attitude, average intelligence, coherent thought process, full consciousness, and had normal attention and memory. (Id.) Glover, however, was anxious and stressed, and she had impaired abstracting ability, poor insight, moderately impaired judgment and fair impulse control. (Id.)

On June 20, 2016, Glover presented with depression, anhedonia and 6/10 sadness. (R. 567.) Glover, however, was well groomed, cooperative, fully oriented, had full consciousness, a logical and directed thought process, average intelligence, and had a normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control. (R. 567-68.)

On the same date, June 20, 2016, Dr. Toba completed a medical source statement in which she diagnosed Glover with anxiety and social phobia with a GAF score of 55. (R. 503-07.) Glover's symptoms included poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations (relating to falling asleep only), anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty concentrating, perceptual disturbances, time or place disorientation, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and pathological dependence or passivity. (R. 503.) Dr. Toba, however, answered "NO" with respect to whether Glover had "[l]oss of intellectual ability of 15 IQ points or more," and stated that Glover did not "have a low I.Q. or reduced intellectual functioning." (R. 503-04.) Dr. Toba opined that Glover would be absent from work more than three times a month, could not sustain performance during an eight hour workday, and her impairments would impact her ability to understand, remember and carry out instructions. (R. 504-05.)

Dr. Toba noted "extreme loss" in the following categories: remembering locations and work-like procedures; understanding, remembering and carrying out very short, simple instructions; understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; maintaining regular attendance and being punctual;

sustaining an ordinary routine without special supervision; dealing with stress of semi-skilled and skilled work; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; completing a normal workday or workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; adhering to basic standards of neatness and cleanliness; responding appropriately to changes in a routine work setting; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places; using public transportation; and setting realistic goals or making plans independently of others. (R. 505-06.) Dr. Toba noted "marked loss" in Glover's ability to interact appropriately with the public, ask simple questions or request assistance, get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior. (R. 506.) Dr. Toba opined that Glover's ability to respond appropriately to supervision, coworkers, and work pressure would be affected by her impairments. (R. 505.)

As to functional limitations, Dr. Toba stated that Glover had a marked limitation in activities of daily living and maintaining social functioning; frequently experienced difficulties in concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings, which caused her to withdraw. (R. 506-07.) Dr. Toba opined that Glover's condition "existed and persisted with the restrictions as outlined in [the] Medical Source Statement at least since" July 2015. (R. 507.)

### Consultative Examination

### L. Blackwell, Ph.D.

On November 30, 2015, state agency psychologist Dr. Blackwell reviewed some of

Glover's records and provided a case analysis. (R. 85-90.) Dr. Blackwell opined that Glover's impairments failed to meet or medically equal §§ 12.04 or 12.06 of the Listing of impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 85-86.) Dr. Blackwell found that Glover had mild restriction in activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties maintaining concentration, persistence and pace. (R. 86.) Dr. Blackwell found that Glover had no significant limitation in most categories of social interaction, and a moderate limitation in her ability to interact with the general public, follow directions and respond to criticism from supervisors. (R. 89.) Dr. Blackwell found that Glover was not significantly limited in seven of eight categories relating to sustaining concentration and persistence. (Id.) Dr. Blackwell noted that Glover had a moderate limitation in her ability to complete a normal workday without experiencing interruptions from her psychological symptoms, and in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) Glover furthermore was moderately limited in her ability to respond appropriately to changes in the work setting and travel independently. (R. 90.) Dr. Blackwell stated that Glover could recognize normal hazards, take proper precautions, set realistic goals and independently organize plans. (Id.)

Dr. Blackwell concluded that Glover was capable of understanding and following simple instructions, making simple decisions, and performing unskilled work in a low contact setting. (Id.)

**Industrial Medicine Associates, P.C.**

**Lucy Kim, Psy.D.**

On March 26, 2016, psychologist Lucy Kim conducted a psychiatric evaluation of Glover and completed a mental medical source statement. (R. 463-69.) Glover stated that she was in regular education, received a high school diploma, and ended her last employment at a nursing

home when she was asked to relocate. (R. 463.) Glover reported difficulty falling sleep, dysphoric moods, psychomotor agitation, anxiety, heart palpitations around crowds and auditory hallucinations, but had a normal appetite and denied cognitive deficits. (Id.) Glover stated that she smoked ten cigarettes a day, and lived with her mother, step-father and son. (R. 463-64.) Dr. Kim wrote that Glover was well groomed, responsive, cooperative and had adequate social skills and overall presentation. (R. 464.) Glover's speech was clear, her expressive and receptive language was adequate, she was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia," and she had a full range affect, euthymic mood, clear sensorium and was fully oriented. (Id.) Glover could count, perform simple calculations, complete serial threes, and repeat four digits forward and three digits backward. (Id.) Her recent and remote memory skills were mildly impaired, "possibly due to distractibility," and she could only recall three out of three objects immediately and none of the objects after five minutes. (Id.) Glover's "[i]ntellectual functioning was average" and her "[g]eneral fund of information was appropriate to experience." (R. 465.)

Glover was able to dress, bathe and groom herself. (Id.) She went shopping on her own, managed her own money, and typically spent her day watching television and sleeping. (Id.) Glover stated that she could not use public transportation by herself due to anxiety, and her mother did all of the cooking, cleaning and laundry. (Id.) Dr. Kim asserted that Glover had no limitations in her ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, and appropriately deal with stress. (Id.) Glover had a mild limitation maintaining attention and concentration and relating adequately with others. (Id.) Dr. Kim stated that the examination results were "consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with [Glover's] ability to function on a daily basis." (Id.)

Glover was diagnosed with unspecified depressive disorder and social anxiety disorder. (Id.) Dr. Kim opined that Glover's prognosis was "[f]air, given [that her] psychological symptoms are not impacting her ADLs." (R. 466.)

Dr. Kim opined in a medical source statement dated the same day, March 26, 2016, that Glover's ability to understand, remember, and carry out instructions was not affected by her impairments but that her ability to interact appropriately with the public, supervisors, and co-workers was mildly impaired. (R. 467-68.) Dr. Kim did not believe that any of Glover's other capabilities were affected by her impairments. (R. 468.)

### Fredelyn Engelberg, Ph.D.

On July 25, 2016, Dr. Fredelyn Engelberg completed a consultative psychiatric evaluation of Glover. (R. 508-12.) Glover traveled to the evaluation by train with her mother. (R. 508.) Glover reported living with her mother and son, went to school in special education, and stopped going to school after being left back twice in the eighth grade. (Id.) Glover stated that she was last employed as a hair stylist and previously worked at McDonald's, as a cashier at Macy's, and as a kitchen aide in a nursing home. (Id.) Glover claimed that she was not "the same since she attempted suicide last year " when she "took pills" but did "not remember what actually happened." (Id.) Glover reported insomnia, difficulty falling asleep, weight gain, depression, anxiety, dysphoric moods, crying spells, fatigue, diminished self-esteem, memory problems and social phobia. (R. 508-09.) Glover believed that her condition was called "'adjustment disorder.'" (R. 509.) She stated that she experienced auditory hallucinations of whispering "'mostly at night'" when she was tired. (Id.) Glover claimed that she saw things when she was sleeping and felt things when she was awake. (Id.)

Glover's demeanor and responsiveness were cooperative, her social skills and overall

presentation were fair, and she displayed limited cognitive skills and spoke slowly. (R. 509-10.) She was dressed neatly and wore appropriate makeup and accessories. (R. 510.) Additionally, Glover presented with "no evidence of hallucinations, delusions, or paranoia in the evaluation setting"; she had a dysphoric affect, dysthymic mood, clear sensorium and full orientation. (Id.) Glover could not count back from twenty by threes and could not make change of eighty cents from one dollar. (Id.) Glover could dress, shower, and groom herself. (R. 511.) She took "public transportation independently on a rare basis," and usually watched tv, listened to music and cared for her son at home. (Id.) Glover stated that her mother does the cooking, cleaning, laundry and shopping because Glover "does not know how to do these things." (Id.)

Dr. Engelberg noted that Glover was able to follow and understand simple directions and instructions, was mildly impaired in her ability to perform simple task independently and in her ability to maintain attention and concentration, moderately impaired in her ability to relate adequately with others and learn new tasks, and significantly impaired in her ability to perform complex tasks independently and deal with stress. (Id.) Dr. Engelberg opined that Glover's psychiatric problems would significantly interfere with her ability to function on a daily basis and that her prognosis was "[g]uarded given [her] psychiatric and cognitive issues." (R. 511-12.)

Dr. Engelberg additionally completed an intelligence evaluation on July 25, 2016 that stated Glover was dressed appropriately, displayed good hygiene, was cooperative and friendly, required repetition of instructions due to difficulty in understanding, and that her style of responding was deliberate, orderly and self-correcting. (R. 513-17.) Glover's attention and concentration were age-appropriate and she exhibited emotional distress and insecurity about her responses, implementing a "tr[ia]l and error approach" when uncertain. (R. 514.)

Dr. Engelberg administered a standardized intelligence measure, The Wechsler Adult

Intelligence Scale, and Glover's results were as follows: verbal comprehension (72); perceptual reasoning index (79); working memory index (74); processing speed index (71); and full scale I.Q. (70). (R. 515.) Each of Glover's scores fell in the "borderline" range. (Id.) Glover "displayed significant deficit in knowledge of vocabulary and ability to define words," "mild deficit in abstract verbal thinking skills," "significant deficits in ability to apply . . . basic processes to arithmetic word problems," and "worked slowly on graphomotor matching tasks." (Id.)

Finally, Dr. Engelberg completed a medical source statement in which she opined that Glover had no limitation in understanding, remembering or carrying out simple instructions, mild limitations in the ability to make judgments on simple work-related decisions, and marked limitations in understanding, remembering and carrying out complex instructions, and the ability to make judgments on complex work-related decisions. (R. 518-20.) Dr. Engelberg stated that Glover had limited vocabulary, arithmetic, abstract verbal reasoning, and short term memory skills, and slow grapho-motor skills. (R. 518.) Additionally, Dr. Engelberg believed that Glover's ability to interact appropriately with supervisors, co-workers and the public, as well as respond to usual changes in a routine work setting would be mildly affected by her impairment. (R. 519.) Finally, Dr. Engelberg concluded that Glover's "[s]ocial anxiety and [her] cognitive weaknesses would be apparent in a job situation requiring interaction with the public and co-workers," and that "[a] supervisor would have to adjust job demands to [Glover's] ability." (Id.)

## ALJ Miller's Decision

On November 23, 2016, ALJ Miller denied Glover's benefits application. (R. 15-30.) ALJ Miller applied the appropriate five step legal analysis. (R. 19-20.) First, ALJ Miller found that Glover "has not engaged in substantial gainful activity (SGA) since October 5, 2015, the amended alleged onset date." (R. 20.) Second, ALJ Miller found that Glover had "the following severe

impairments: a history of depression, a generalized anxiety disorder, a bipolar disorder and a learning disorder." (R. 21.) Third, ALJ Miller found that Glover also had "non-severe impairments: scoliosis, a lumbar pain disorder and headaches." (Id.) Fourth, ALJ Miller found that Glover did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 21.) ALJ Miller determined that Glover had the residual functional capacity ("RFC") to perform

> a full range of work at all exertional levels but with the following non-exertional limitations: work allowing the performance of simple, routine and repetitive tasks that can be explained, specifically SVPs of 1 and 2 which involve making simple decisions, and only occasional changes in routine, no work with the general public and only occasional and superficial contact with co-workers and supervisors.

(R. 23.)

ALJ Miller discussed the opinion of medical expert Dr. Carver. (R. 23-24.) Dr. Carver opined that Glover's work history was commensurate with her education, and Glover was not fired from her last job at the nursing home due to psychological problems, but because she refused to relocate. (R. 24-25.) Dr. Carver stated that Glover did not have a condition that would create selective memory deficits, and that Glover "had depression but it did not reach listing level under the 'B' criteria." (R. 25.) Dr. Carver also opined that the "record suggest[ed] symptom exaggeration" and that the "record was consistent until [Glover] was diagnosed with extreme mental limitations." (Id.) Dr. Carver stated that Glover's "reports of extreme limitations have to be given low credibility because [they are] not consistent with her psychological examinations before or after that time." (Id.) Glover, however, would have difficulty with complex job instructions and moderate problems working with others, required predictable work activities, and had mild difficulty with others. (Id.)

Dr. Carver additionally stated that Dr. Toba's medical source statement that included

extreme limitations in Glover's "mental-related work ability [was] 'exaggerated.'" (R. 24.) Dr. Carver stated "that an extreme loss in [Glover] being able to understand simple instructions is not correct because the ability to understand simple instructions is the requirement of an interview." (Id.) Dr. Carver "also reported that [Glover] stated that she had auditory hallucinations, which were not hallucinations, but were actually normal noises people heard before falling asleep." (Id.) Moreover, Dr. Carver opined that Glover's statement to Dr. Engelberg during her July 25, 2016 evaluation that she did not know how to perform several activities of daily living "was an exaggeration." (Id.) Dr. Carver further opined "that there was no evidence to support her psychiatrist's assessed extreme limitations" and that "the doctor's treatment notes showed no indication that [Glover] had an extreme or marked mental impairment." (Id.)

From July 23, 2015 through October 13, 2015, records from Bronx-Lebanon Hospital Center showed Glover "had mostly normal mental status examinations." (R. 25.) Glover stated to Dr. Patel on October 6, 2015 that her mood was stable and she was less depressed, and Dr. Patel found that "her same day mental status examination was normal." (Id.) Dr. Patel also found that Glover's mental status examination was normal on September 8 and August 11, 2015. (Id.)

On November 16, 2015, social worker Tanya Gaston noted that Glover was less depressed, had a stable mood, good energy, and good concentration, and was not hopeless or helpless. (Id.) From January through June 2016, Glover's mental status examinations were "essentially normal." (Id.) While on June 20, 2016, Glover reported feeling depressed, she also stated that she only took her medication "'sporadically.'" (Id.) ALJ Miller also noted that Dr. Kim wrote in her March 26, 2016 consultative psychological examination that Glover had a full affect, a euthymic mood, normal thought process, intact attention and concentration, a mildly impaired memory and fair insight and judgment. (R. 26.)

ALJ Miller found Glover's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Id.) ALJ Miller noted that Glover testified that she had no hobbies and stays in her house. (R. 24.) Glover further stated that she felt disabled because of her anxiety and memory problems. (Id.) ALJ Miller opined that Glover's testimony that she could not work due to her mental impairments was not consistent with her October 16, 2015 Activities of Daily Living Report, which stated that she cared for her son on a daily basis, suggesting a higher level of functioning than Glover's testimony indicated. (R. 26.) ALJ Miller noted that Dr. Carver testified that Glover "exaggerated the severity of her psychological symptoms at her July 201[6] consultative examination, since her treatment records show primarily benign mental status examinations and improved depression." (Id.) Dr. Carver "stressed that [Glover] was capable of performing simple tasks due to her history of semi-skilled work, her regular high school diploma and her ability to engage in interviews during examinations." (Id.) Dr. Carver "also stated that despite [Glover's] treating psychiatrist writing in June 2016 that [Glover] had marked to extreme mental limitations, that [Glover's] mental status examinations before and after that date were relatively benign." (Id.) ALJ Miller stated that throughout 2015 and 2016, Glover reported improvement in her mood and her March 26, 2016 consultative examination with Dr. Kim yielded normal results. (Id.)

ALJ Miller, however, gave Dr. Kim's March 26, 2016 evaluation "little weight." (Id.) ALJ Miller found that Dr. Kim's opinion that Glover had no limitations in attention and concentration, mild limitation in interacting appropriately with others, and little to no limitations in any work-related mental activity were not supported by the record which showed that Glover did "have severe mental impairments." (Id.)

ALJ Miller additionally discussed Dr. Engelberg's evaluation of Glover. (R. 27.) In

Dr. Engelberg's July 25, 2016 opinion, she stated that Glover's mental impairments would significantly interfere with her functioning and that she would have significant stress limitations. (Id.)  ALJ Miller gave this assertion "little weight" because the "treatment records show and the medical expert testified that [Glover's] treatment records show only mild to moderate mental limitations and nothing that would preclude work."  (Id.)

However, Dr. Engelberg's intelligence and psychological consultative examination reports also stated Glover could perform simple tasks and maintain a regular schedule, and that she had moderate limitations in relating to others.  (Id.)  ALJ Miller gave this portion of the evaluation "great weight" because it was supported by Dr. Carver's testimony that Glover would have some social interaction limitations but could perform simple tasks.  (Id.)  ALJ Miller added that the assessment also was supported by treating mental status examination reports, which established that Glover only had "mild to moderate mental limitations."  (Id.)  "[F]or the same reasons," ALJ Miller gave Dr. Blackwell's November 30, 2015 consultative opinion that Glover was not disabled and had mild to moderate mental limitations "great weight."  (Id.)

Dr. Engelberg's medical source statement opinion that Glover had mild limitations in social functioning, no limitations in performing simple tasks and marked limitations in performing complex tasks was given "partial weight."  (Id.)  ALJ Miller reasoned that although the treatment records showed some attention and concentration limitations, "none of that testing [wa]s significant enough to preclude [Glover] from performing simple tasks."  (Id.)  ALJ Miller highlighted Dr. Carver's testimony that the capacity to understand simple instructions is a requirement for any type of mental status examination interview, which Glover underwent numerous times.  (Id.)

Additionally, Dr. Carver's testimony that Glover's I.Q. score of 70 did not meet any

Listing because it was based on an examination in which Glover exaggerated her symptoms was given "great weight." (Id.) ALJ Miller noted that Dr. Carver's opinion was "supported by a same day examination showing that [Glover] often changed her answers to questions." (Id.) ALJ Miller added that despite Dr. Engelberg's opinion that Glover's "responses were valid," her notes from the same day contradicted that statement by describing Glover as "changing her answers and having a trial and error approach to questions," which weakened the validity of Glover's I.Q. testing. (Id.)

ALJ Miller gave "little weight" to Dr. Toba's June 20, 2016 medical source statement opinion that Glover had marked to extreme loss in a wide variety of mental-related work activities because it was not supported by Dr. Toba's opinion in the same report that Glover had a GAF score of 55, indicating moderate mental limitations. (Id.) Dr. Carver also testified that Dr. Toba's treatment records showed that Glover had "primarily benign findings" and although the record stated that Dr. Toba saw Glover once every two months, it did not include the length of their treatment relationship. (R. 27-28.)

ALJ Miller gave Glover's GAF scores of 50, 55 and 60 some weight, stating that "generally GAF scores represent a subjective interpretation of the claimant's general functioning at the particular time of the assessment." (R. 28.) ALJ Miller added that GAF scores "are vague, one-time assessments of the claimant's general symptomology and do not represent the claimant's overall functioning over any significant period of time." (Id.) Nevertheless, ALJ Miller considered the scores in his assessment of Glover's functional limitations. (Id.)

ALJ Miller next determined that Glover could not perform her past relevant work, but was a younger individual with a high school education who spoke English. (Id.) Considering Glover's "age, education, work experience, and residual functional capacity," ALJ Miller concluded that jobs existed in significant numbers that Glover could perform, including those identified by

vocational expert Mary Anderson such as merchandise marker, stamper, room attendant, lab equipment cleaner and address clerk. (R. 28-29.) ALJ Miller accordingly concluded that Glover had "not been under a disability, as defined in the Social Security Act, from October 5, 2015, through the date of [his] decision," November 23, 2016. (R. 29.)

## ANALYSIS

## I.     THE APPLICABLE LAW

### A.     Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[3/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

---

[3/]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[4/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[5/]

B.    **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[6/] "'Thus,

---

[4/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[5/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[6/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[7]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[8] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[9]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

---

[7]    See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[8]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[9]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

2012); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

<u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[10/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[10/]    Accord, <u>e.g.</u>, <u>Talavera</u> v. <u>Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 774; <u>see also</u>, <u>e.g.</u>, <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 183-84; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 132; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training. <u>See</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 25, 124 S. Ct. at 379-80.[11/]

C. **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); <u>see</u>, <u>e.g.</u>, <u>Rugless</u> v. <u>Comm'r of Soc. Sec.</u>, 548 F. App'x 698, 699-700 (2d Cir. 2013); <u>Meadors</u> v. <u>Astrue</u>, 370 F. App'x 179, 182 (2d Cir. 2010); <u>Colling</u> v. <u>Barnhart</u>, 254 F. App'x 87, 89 (2d Cir. 2007); <u>Lamorey</u> v. <u>Barnhart</u>, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x 71, 74 (2d

---

[11/]    <u>See also</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d at 418; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x 25, 26 (2d Cir. 2006); <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 80; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d at 467.

Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010).[12/]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).[13/]

---

[12/]   See also, e.g., <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x 344, 346-47 (2d Cir. 2005); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998).

[13/]   Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017.  See 20
(continued...)

II.      **APPLICATION OF THE FIVE STEP SEQUENCE**

    A.      **Glover Was Not Engaged In Substantial Gainful Activity**

The first inquiry is whether Glover was engaged in substantial gainful activity after her application for benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Miller's conclusion that Glover did not engage in substantial gainful activity during the applicable time period (see pages 22-23 above) benefits Glover and is not disputed. (See generally Dkt. No. 22: Comm'r Br.) The Court therefore proceeds with the analysis.

    B.      **Glover Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Glover proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

ALJ Miller determined that Glover's severe impairments were a history of depression, a generalized anxiety disorder, a bipolar disorder and a learning disorder. (See page 23 above.) ALJ

---

[13]/      (...continued)
C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

Miller's findings regarding the step-two severity of these impairments are not contested. (See generally Dkt. No. 19: Glover Br.)

Glover, however, argues that ALJ Miller erred in finding that Glover's physical impairments, i.e., her back pain and headaches, were not severe. (Glover Br. at 17.) Glover further argues that, "having found these impairments non-severe, the ALJ was still required to consider them in his RFC determination." (Id. at 18.)

In her function report, Glover stated that she "can't stand up for a long time," "can't walk too long [because her] back will hurt," "can't sit up straight," and cannot climb stairs "too much." (See page 3 above.) Glover stated she can walk five blocks before she has to stop and rest for ten minutes. (See pages 3-4 above.) Dr. Joshi, however, noted that Glover was in no acute distress, had a normal gait and stance, could walk on her heels and toes without difficulty, could squat fully, used no assistive devices, needed no help changing or getting on and off the exam table, and could rise from her chair without difficulty. (See page 9 above.) Additionally, Glover had full range of motion of her hips, knees and ankles bilaterally, and stable joints. (Id.) The only abnormalities noted were tenderness in the upper lumbar spinal area, trigger points paraspinally, and 4/5 lower extremity strength. (Id.) Dr. Joshi opined that Glover "should avoid heavy lifting, carrying, pushing, and pulling" and that Glover had "marked limitations with bending." (Id.) Glover's physical examination with Dr. Simela was normal; she appeared in no distress, had normal gait, scored a 5/5 in all categories of strength and had a negative straight leg raise test bilaterally. (Id.) Dr. Simela told Glover that her degree of scoliosis would not usually cause back pain, and that the pain was "quite likely" caused by being overweight. (Id.)

In finding Glover's headaches and back pain non-severe, ALJ Miller discussed Glover's medical records from Dr. Joshi and Dr. Simela, and Glover's October 16, 2015 function

report. (R. 21.) ALJ Miller gave Dr. Joshi's opinion that Glover should avoid heavy lifting and had a marked bending limitation "little weight," since Glover's "limited physical examinations in the record are relatively benign and . . . she stated that her back pain responded to medication." (Id.) ALJ Miller concluded: "The evidence fails to establish that [Glover's] headaches and lumbar impairments have greater than a slight or minimal effect on her ability to perform basic work activities, and thus, these are non-severe impairments." (Id.) Moreover, Glover's counsel had represented at the hearing before ALJ Miller that the issue was "just mental problems, no[t] physical," and "[t]his is a psychiatric case." (R. 45.)

Even if ALJ Miller erred in finding that Glover's back pain and headaches were non-severe, any error is harmless because ALJ Miller found that Glover's psychological impairments were severe, and thus proceeded with the disability analysis, and provided an alternate RFC determination that incorporated Glover's physical restrictions. (R. 23 n.1); see, e.g., Vasquez v. Berryhill, 16 Civ. 6707, 2017 WL 1592761 at *20 (S.D.N.Y. May 1, 2017) (Peck, M.J.) ("Moreover, even if [the] ALJ erred in finding Vasquez's knee pain non-severe at step two, any error would be harmless because [the] ALJ identified other severe impairments and discussed Vasquez's knee pain at subsequent steps of the analysis." (& cases cited therein)). At the hearing, ALJ Miller posed two hypothetical questions to vocational expert Anderson, the first of which asked:

> [P]lease consider a hypothetical individual of [Glover's] age, education, work experience, and the residual functional capacity to lift and/or carry up to 20 pounds occasionally, 10 pounds frequently, stand and/or walk with normal breaks for a total of about six hours in an eight-hour work day, sit with normal breaks for a total of about six hours in an eight-hour work day. Can occasionally climb ramps or stairs, no ladders, ropes, or scaffolds, occasionally balance, kneel, crouch, squat, and no crawling, and no bending. Does not require manipulation utilizing the bilateral lower extremities such as foot controls or foot pedals, does not involve hazards such as dangerous machinery, motor vehicles, unprotected heights, or vibrations. That takes into account non-exertional limitations allowing the performance of simple, routine, and repetitive tasks that can be explained, specifically SVPs 1 and 2 which involve

> making simple decisions, occasional changes in routine, no work with the general
> public, and only occasional and superficial contact with coworkers and supervisors.
> With these limitations, would there be any jobs?

(See page 7 above.)  Anderson testified that an individual with these limitations could do the work

of a merchandise marker, stamper and room attendant, which exist in substantial numbers in the

national economy.  (See pages 7-8 above.)

ALJ Miller's hypothetical question adequately accounted for the physical restrictions

Dr. Joshi identified in his report, and Glover makes no argument that her headaches or back pain

would have further limited her RFC.  (See Glover Br. at 17-19.)  Moreover, ALJ Miller specifically

incorporated the above hypothetical in the RFC portion of his opinion in an alternate finding.  (R.

23 n.1; see also Dkt. No. 22: Comm'r Br. at 23 ("Moreover, plaintiff's argument that the ALJ did not

properly consider her allegations of back pain ignores that the ALJ made an alternate residual

functional capacity finding for a narrow range of light work.  In this alternate finding, the ALJ

included all the limitations that plaintiff claims should have been included in the residual functional

capacity assessment . . . ." (record citation omitted)).)[14]  Any error in finding Glover's physical

impairments non-severe is harmless.

## C.    Glover Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Glover had

an impairment listed in Appendix 1 of the Regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  "These

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude

---

[14]    The Court also notes that Glover and her attorney explicitly directed ALJ Miller's attention
away from Glover's physical impairments.  At the first hearing, ALJ Miller asked Glover:
"Do you have any physical problems, or are they all mental?"  (See page 4 above.)  Glover
responded that her problems are "mainly mental."  (Id.)  ALJ Miller also asked Glover's
attorney, "And is it just mental problems, no physical?"  (Id.)  Glover's attorney responded,
"That's correct.  This is a psychiatric case."  (Id.)

gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Miller found that notwithstanding Glover's severe impairments, she did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (<u>See</u> page 23 above.) ALJ Miller stated that he compared the record medical evidence to the Listing requirements, and found that Glover had not met the necessary criteria. (R. 21.) Glover challenges ALJ Miller's conclusion, arguing that Glover's impairments meet mental impairment Listings § 12.04 and/or § 12.05. (Dkt. No. 19: Glover Br. at 15-17.)

### 1. Listing § 12.04

With regard to mental impairments, the SSA "will find that [a claimant] ha[s] a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).[15/] To satisfy paragraph B under Listing 12.04, Glover must show at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

---

[15/] The Listings cited are those in effect on November 23, 2016, the date of ALJ Miller's decision. (<u>See</u> page 22 above; <u>see also</u> Dkt. No. 19: Glover Br. at 16 n.10.)

To satisfy paragraph C under Listing 12.04, Glover must show:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).

ALJ Miller found that Glover had a mild restriction in her activities of daily living, citing Glover's October 16, 2015 function report in which she stated that "on a daily basis, she fed her son, got him ready for school, attended appointments and did everything he needed."  (R. 22.) In social functioning, ALJ Miller found that Glover had moderate difficulties, again citing Glover's function report in which Glover stated that "she had no problems getting along with authority figures and never lost a job because of problems getting along with people."  (Id.)  However, ALJ Miller also noted that Dr. Carver testified that Glover's records indicated that she had some moderate limitations in social interaction, and Glover told Dr. Patel in July 2015 that she was always anxious around groups of people.  (Id.)  ALJ Miller found that Glover had moderate difficulties in concentration, persistence and pace, and Glover noted in her function report that "she had problems paying attention and could not finish what she started."  (Id.)  While Glover's treatment providers noted her concentration difficulties, "she tested as having normal concentration and only a mildly impaired memory at her March 2[6], 2016 psychological consultative examination" with Dr. Kim.

(Id.)  Dr. Carver also testified that Glover had experienced only one episode of decompensation related to a possible overdose.  (Id.)  Thus, because Glover's impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, the Paragraph B criteria were not satisfied.  (Id.)  As to the Paragraph C criteria, ALJ Miller found no evidence that Glover's impairments satisfied any of the enumerated criteria.  (R. 23.)

Glover argues that "Dr. Toba's opinion that Ms. Glover had . . . marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace; and repeated episodes of deterioration or decompensation, indicates she . . . met the criteria of Listing § 12.04B."  (Glover Br. at 15, record citation omitted.)  However, although Dr. Toba found marked to extreme limitations in multiple functional categories, ALJ Miller assigned little weight to her opinion, which was not the sole piece of evidence in the record as to Glover's limitations.  ALJ Miller relied on Dr. Carver's testimony, Dr. Kim's psychiatric evaluation and Glover's function report.

In her October 16, 2015 function report, Glover stated that she feeds her son, gets him ready for school, takes him to doctor's appointments and does "everything he need[s]," albeit with assistance from her mother and step-father.  (See page 3 above.)  Glover stated that she goes shopping "once a month for a[n] hour," that she has no problem getting along with "bosses . . . or other people in authority," and has never lost a job "because of problems getting along with people." (Id.)

Dr. Carver opined that Glover is "totally capable of reaching daily activities, laundry, shopping, so forth," "may have mild impairment in dealing with others," and that her "[c]oncentration, persistence, and pace may be mildly impaired."  (See page 6 above.)  Dr. Carver also stated that "if we look at the records by the psychiatrist before and after that medical source

statement, the mental status examinations only reflect the mild impairment in depression. Nothing certainly that would meet the criteria for an extreme or marked impairment." (Id.) Dr. Carver opined that "none of [Glover's] impairments singly or in combination meet or equal any of the listings." (See page 7 above.) Dr. Kim also opined that Glover had a mild limitation maintaining attention and concentration and relating adequately with others. (See page 19 above.)

The Court further notes that Dr. Blackwell found that Glover had mild restriction in activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties maintaining concentration, persistence and pace. (See page 18 above.) Dr. Blackwell found that Glover was capable of performing unskilled work in a low contact setting, and that her impairments did not meet Listing § 12.04. (Id.) Moreover, ALJ Miller noted elsewhere in his opinion that Dr. Carver stated that, despite Dr. Toba's findings that Glover had multiple marked to extreme limitations, many of Glover's records during the same period from Dr. Toba and others included "relatively benign" findings. (See page 25 above.)[16] Indeed, Dr. Toba's June 20, 2016 treatment

---

[16]     (See pages 10-15 above: 8/11/15 (well groomed, cooperative, fully oriented, logical and directed thought process, average intelligence, full consciousness, normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control); 9/8/15 (average intelligence, logical and directed thought process, normal speech, mood, orientation, memory, reasoning, insight, judgment, attention, concentration and cognition); 10/6/15 (average intelligence, logical and directed thought process, normal speech, mood, orientation, memory, reasoning, insight, judgment, attention, concentration and cognition); 7/23/15 (well groomed, cooperative, fully oriented, concrete thought process, full consciousness, denied hallucinations, normal speech, attention and memory); 11/16/15 (fully oriented, well groomed, average intelligence, logical and directed thought process, normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight and judgment); 1/14/16 (well groomed, cooperative, fully oriented, calm, average intelligence, normal speech, memory, attention with a coherent thought process); 1/22/16 (fully oriented, no delusions, average intelligence, intact concentration, attention, insight, judgment and memory, normal reasoning, adequate impulse control, logical and directed thought process); 3/25/16 (cooperative, good eye contact, coherent thought process, full level of consciousness, normal attention and reasoning, fair insight and impulse control);
(continued...)

notes, dated the same day as her medical source statement, found that Glover was well groomed, cooperative, fully oriented, had full consciousness, a logical and directed thought process, average intelligence, and had a normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control.  (See page 16 above.)

ALJ Miller's finding that Glover's impairments did not meet Listing § 12.04 is supported by substantial evidence.

### 2.    Listing § 12.05

Listing § 12.05 concerns an intellectual disability, which "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR

---

16/    (...continued)
3/31/16 (well groomed, cooperative, fully oriented, logical and directed thought process, average intelligence, full consciousness, normal speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control); 4/29/16 (well groomed, cooperative, fully oriented, logical and directed thought process, average intelligence, full consciousness, normal attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control); 6/6/16 (fully oriented, good eye contact, open attitude, average intelligence, coherent thought process, full consciousness, normal attention and memory).)

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Glover claims to satisfy Listing § 12.05 because of her I.Q. score. (Dkt. No. 19: Glover Br. at 16-17.) Dr. Carver's testimony that Glover's I.Q. score of 70 did not meet any Listing section because it was based on an examination in which Glover exaggerated her symptoms was given "great weight" by ALJ Miller. (See page 27 above.) ALJ Miller noted that Dr. Carver's opinion was "supported by a same day examination showing that [Glover] often changed her answers to questions." (Id.) ALJ Miller added that despite Dr. Engelberg's opinion that Glover's "responses were valid," her notes from the same day contradicted that statement by describing Glover as "changing her answers and having a trial and error approach to questions," which weakened the validity of Glover's I.Q. testing. (Id.)

Dr. Carver stated that Glover "offer[ed] contradictory information, stating that she went to the eighth grade in special education," rather than regular classes as reflected elsewhere in the record. (See page 5 above.) Dr. Carver further noted that Glover told Dr. Engelberg that her mother does the cooking, cleaning, laundry and shopping because Glover "does not know how to

do these things."  (See page 6 above.)  Dr. Carver opined that it is "clearly an exaggerated statement for a person who has worked as a cashier" and as a kitchen aide in a nursing home to claim an inability to cook, clean, do laundry, or shop.  (See page 5 above.)

In her function report, Glover stated that she feeds her son, gets him ready for school, takes him to doctor's appointments and does "everything he need[s]," albeit with assistance from her mother and step-father.  (See page 3 above.)  Glover's function report also stated that she goes shopping "once a month for a[n] hour," and she told Dr. Kim that she went shopping on her own. (See pages 3, 19 above.)  ALJ Miller was entitled to consider the inconsistencies in Glover's statements to Dr. Engelberg and elsewhere in the record in discounting her I.Q. score.  (See Dkt. No. 22: Comm'r Br. at 21 ("As the ALJ noted, this symptom magnification called into question the validity of the IQ test."); see also, e.g., Burnette v. Colvin, 564 F. App'x 605, 608 (2d Cir. 2014); Latham v. Colvin, No. 15-CV-131, 2016 WL 6067848 at *6 (W.D.N.Y. Oct. 17, 2016) ("[T]he ALJ was within his province to bifurcate portions of Dr. Baskin's medical evidence, accepting opinions that were consistent with the record and rejecting other portions that were exaggerated and inconsistent when compared to the medical record as a whole.").  ALJ Miller also consulted a medical expert, Dr. Carver, to reach her determination that Glover's I.Q. score did not meet any Listing section.

The Court further notes that, in her medical source statement, Dr. Toba—Glover's treating physician—answered "NO" with respect to whether Glover had "[l]oss of intellectual ability of 15 IQ points or more."  (See page 16 above.)  Dr. Toba further opined that Glover did not "have a low I.Q. or reduced intellectual functioning."  (Id.)  Dr. Kim also found that Glover's "intellectual functioning was average" and that her "[g]eneral fund of information was appropriate to experience," and Glover denied any cognitive deficits.  (See page 19 above.)  Moreover, on August 11,

September 8, October 6 and November 16, 2015, and January 14, January 22, March 31, April 29, June 6, and June 20, 2016, Glover had average intelligence, a logical/coherent/directed thought process, and normal attention and memory. (See pages 10-16 above.) At several of these visits, Glover also had normal concentration, cognition, reasoning, insight and/or judgment. (See id.) The Court finds that ALJ Miller properly discounted Glover's IQ score, and Glover has not shown (or argued) how she otherwise might meet the criteria of Listing § 12.05. (See Glover Br. at 16-17.)

**D.     ALJ Miller's RFC Determination**

ALJ Miller determined that Glover had the RFC to perform

> a full range of work at all exertional levels but with the following non-exertional limitations: work allowing the performance of simple, routine and repetitive tasks that can be explained, specifically SVPs of 1 and 2 which involve making simple decisions, and only occasional changes in routine, no work with the general public and only occasional and superficial contact with co-workers and supervisors.

(See page 23 above.)

Glover argues that ALJ Miller "erred in rejecting the long-term treating psychiatrist's [Dr. Toba] opinion in favor of the opinions of a[n] ME [Dr. Carver] who never saw" Glover, and whose opinion allegedly contained numerous errors, "and of . . . Dr. Kim, who only saw [Glover] once." (Dkt. No. 19: Glover Br. at 11.) Glover argues that Dr. Toba's opinions are supported by the records from Dr. Patel and social worker Tonya Gaston, "who frequently opined that Ms. Glover's persistent psychiatric symptoms impaired her function in important life areas." (Glover Br. at 11-12.) Glover also argues that Dr. Engelberg's psychiatric evaluation indicated that Glover had significant psychiatric problems, and thus corroborated Dr. Toba's opinion. (Glover Br. at 12.)

Although Glover cites numerous alleged errors in Dr. Carver's medical expert testimony (see Glover Br. at 12-14), Dr. Carver and ALJ Miller discounted Dr. Toba's opinions primarily due to inconsistencies in Dr. Toba's own treatment notes, which finds support in the

record. ALJ Miller explained that he gave "little weight" to Dr. Toba's June 20, 2016 medical source statement opinion that Glover had marked to extreme loss in a wide variety of mental-related work activities because it was not supported by Dr. Toba's opinion in the same report that Glover had a GAF score of 55, indicating moderate mental limitations. (See page 27 above.) ALJ Miller also noted Dr. Carver testified that Dr. Toba's treatment records showed "primarily benign findings." (Id.)

As discussed above, Glover's treatment notes with Dr. Toba and others often included a variety of normal findings. (See page 41 n.16 above.) Indeed, Dr. Toba's June 20, 2016 treatment notes dated the same day as her medical source statement found that Glover was well groomed, cooperative, fully oriented, had full consciousness, a logical and directed thought process, average intelligence, and had a normal mood, affect, speech, attention, concentration, cognition, memory, reasoning, insight, judgment and impulse control. (See page 16 above; see also Dkt. No. 22: Comm'r Br. at 18-19 ("Dr. Carver also noted that Dr. Toba's own treatment notes from the same time period as her opinion were inconsistent with the level of limitation she assessed. Indeed, on June 20, 2016, the very same day that Dr. Toba assessed extreme limitations in Plaintiff's ability to do even the simplest of mental tasks, Dr. Toba's records indicate that Plaintiff's mood was normal, with appropriate affect, normal thoughts, full orientation, and intact attention, concentration, memory, insight, and judgment." (record citation omitted)).

ALJ Miller appropriately applied the treating physician rule and supported his decision to give Dr. Toba's opinion little weight with good reasons, supported by the record evidence.

E. **Glover Did Not Have The Ability to Perform Her Past Relevant Work**

The fourth step of the five-step analysis asks whether Glover had the residual

functional capacity to perform her past relevant work.  (See page 31 above.)  Glover previously

worked as a hairstylist and at a nursing home.  (See page 2 above.)  ALJ Miller concluded that

Glover did not have the ability to perform her past relevant work.  (See page 27 above.)  Because

this finding favors Glover, the Court proceeds to the fifth and final step of the analysis.

**F.    There Are Jobs In Substantial Numbers In The Economy That Glover Can Perform**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980).[17]

In meeting her burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,
> Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account
> the claimant's residual functional capacity in conjunction with the claimant's age,
> education and work experience.  Based on these factors, the Grid indicates whether
> the claimant can engage in any other substantial gainful work which exists in the
> national economy.  Generally the result listed in the Grid is dispositive on the issue
> of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x

87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

---

[17]    See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc.
Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir.
2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d
72, 77 (2d Cir. 1999).

1996); <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." <u>Vargas</u> v. <u>Astrue</u>, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); <u>see also</u>, <u>e.g.</u>, <u>Travers</u> v. <u>Astrue</u>, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), <u>R. & R. adopted</u>, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); <u>Lomax</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 410 (2d Cir. 2010) (quoting <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 605); <u>see also</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 603, 605-06)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Miller properly relied on the testimony of vocational expert Mary Anderson, who testified that a person with Glover's RFC could not perform her past work, but could perform the jobs of merchandise marker, stamper, room attendant, lab equipment cleaner and address clerk. (See page 28 above.)  These jobs are light, unskilled positions (with the exception of address clerk, which is sedentary) (R. 29), and Anderson testified that they all exist in significant numbers in the national economy.  (See pages 7-8 above.)  ALJ Miller relied on Anderson's testimony in reaching his step five determination when he specifically referred to those jobs in his findings.  (See page 28 above.)  Accordingly, ALJ Miller's decision at step five was supported by substantial evidence.  See, e.g., Rodriguez v. Berryhill, 16 Civ. 8752, 2017 WL 3701220 at *20 (S.D.N.Y. Aug. 28, 2017) (Peck, M.J.).

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Glover was not disabled within the meaning of the Social Security Act during the period from October 5, 2015 to November 23, 2016 is supported by substantial evidence.  Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 21) is GRANTED and Glover's motion (Dkt. No. 18) is DENIED.

SO ORDERED.

Dated:     New York, New York
           February 7, 2018

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:       All Counsel